Argued and submitted February 15, 2022, reversed and remanded May 3, 2023

Loren HATHAWAY,
on behalf of himself and all others
similarly situated within the state of Oregon;
Gennise Hathaway, on behalf of herself and all others
similarly situated within the state of Oregon; and
Heather Noble, on behalf of herself and all others
similarly situated within the state of Oregon,
*Plaintiffs-Respondents,*

*v.*

B & J PROPERTY INVESTMENTS, INC.,
an Oregon corporation;
Better Business Management, Inc., an Oregon
corporation doing business as Salem RV Park; and
William J. Berman, an individual,
*Defendants-Appellants.*

Marion County Circuit Court
13C14321; A169427

531 P3d 152

In 2013, plaintiffs Loren and Gennise Hathaway (the Hathaways) filed suit on behalf of themselves and all similarly situated persons against Better Business Management, Inc. (BBM), the manager of Salem RV Park, where the Hathaways lived, alleging that certain park utility billing practices violated ORS 90.315(4) (2011) of the Oregon Landlord Tenant Act (ORLTA). As the litigation progressed, plaintiffs brought an additional claim for unlawful retaliation under ORS 90.385 after the park raised monthly rents by $20 in the first months of litigation. By late 2017, the court had resolved nearly all the issues in the litigation, largely through a series of partial summary judgment rulings that, in total, held BBM liable to plaintiffs for violations of the ORLTA pursuant to ORS 90.315(4) (2011) and ORS 90.385 and awarded plaintiffs nearly $5 million in damages. BBM asserts nine assignments of error arising from class certification, summary judgment rulings for plaintiffs on the ORLTA claims, an order directing defendants to bear the costs of class notice, the court's order striking defendant's "good faith" affirmative defense, and the attorney fee award. *Held*: The Court of Appeals concluded that the trial court erred (1) in certifying a 10-year class for plaintiffs' claims under ORS 90.315(4) (2011), a ruling which was based on the court's conclusion that a discovery rule applied to the statute of limitations for plaintiffs' ORLTA claims, ORS 12.125, as described in BBM's second assignment of error; (2) in granting partial summary judgment to plaintiffs on the issue of BBM's liability under ORS 90.315(4) (2011) for its rate billing practices, a ruling that was due to the trial court's conclusion that BBM violated ORS 90.315(4) (2011) as a matter of law when it charged tenants a higher kilowatt-per-hour (kWh) rate for electricity than the electricity utility had charged BBM, as described in BBM's first assignment of error; and (3) in granting partial summary judgment to plaintiffs on the issue of damages under ORS 90.315(4) (2011) based on its erroneous

interpretation of the damages provision in ORS 90.315(4)(e) (2011), as described in BBM's seventh assignment of error. The court also concluded that several rulings were not erroneous—specifically, the trial court's grant of partial summary judgment to plaintiffs on the issue of BBM's liability under ORS 90.315(4) (2011) for its "meter reading fee," a ruling which was based on its conclusion that BBM's $10 meter reading fee violated ORS 90.315(4) (2011) as a matter of law, as described in BBM's second assignment of error, and the trial court's grant of partial summary judgment to plaintiffs on their retaliation claim, a ruling which was based on the trial court's conclusion that BBM's rent increase constituted retaliation under ORS 90.385 as a matter of law, as described in BBM's fifth assignment of error. The court also concluded that, to the extent that the trial court erred as alleged in BBM's sixth assignment of error in striking BBM's good faith defense, any error was harmless. The court summarily rejected or did not need to address the other assignments of error.

Reversed and remanded.

Dennis J. Graves, Judge. (General Judgment dated October 31, 2018)

Donald D. Abar, Judge. (Supplemental Judgment dated January 2, 2020)

Matthew J. Kalmanson argued the cause for appellants. Also on the briefs were Hart Wagner LLP, and Janet M. Schroer.

Rick Klingbeil argued the cause for respondents. Also on the briefs were Rick Klingbeil, PC, Brady Mertz, PC, and Brady Mertz.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Reversed and remanded.

**SHORR, P. J.**

This appeal reaches us following nearly seven years of class-action litigation in the trial court. In 2013, plaintiffs Loren and Gennise Hathaway (the Hathaways) first filed suit on behalf of themselves and all similarly situated persons against the owners and managers of Salem RV Park, where the Hathaways lived, alleging that certain park utility billing practices violated ORS 90.315(4) (2011) of the Oregon Landlord Tenant Act (ORLTA).[1] Originally, the defendants to the action were Better Business Management, Inc. (BBM), which managed the park, and B & J Property Investments, Inc. (B & J), which owned the land. As the litigation progressed, more named plaintiffs joined; plaintiffs added William Berman, an owner and president of BBM and B & J, as a defendant; plaintiffs brought an additional claim for unlawful retaliation under ORS 90.385 after the park raised monthly rents by $20 in the first months of litigation; and, eventually, plaintiffs sought to pierce BBM's corporate veil to recover damages for BBM's violations from both B & J and Berman individually.[2]

By late 2017, the court had resolved nearly all the issues in the litigation, largely through a series of partial summary judgment rulings that, in total, held BBM liable to plaintiffs for violations of the ORLTA pursuant to ORS 90.315(4) (2011) and ORS 90.385 and awarded plaintiffs nearly $5 million in damages. The case then proceeded to a bench trial solely on the issue of whether to pierce BBM's corporate veil to permit plaintiffs to recover those damages from B & J and Berman. The court again ruled in plaintiffs' favor and entered a general judgment against all three defendants, "and each of them," on plaintiffs' claims. Over the next year, litigation over attorney fees and costs

---

[1] ORS 90.315(4) (2011) was subsequently amended after plaintiffs filed their class action complaint. *See* Or Laws 2015, ch 388, § 8. As a result, we refer to the 2011 version of the statute throughout this opinion. Where other ORLTA statutes mentioned in this opinion have substantively changed since plaintiffs filed their action, we cite to the 2011 versions of those statutes as well.

[2] Plaintiffs also alleged other claims during the litigation pursuant to ORS 646.608 of the Unlawful Trade Practices Act and ORS 124.100 for financial abuse of elderly persons. Those claims were ultimately unsuccessful and are not at issue on appeal.

ultimately resulted in entry of a supplemental judgment awarding plaintiffs nearly $1 million in fees.

Defendants appeal from the court's general and supplemental judgments. BBM asserts nine assignments of error arising from class certification, summary judgment rulings for plaintiffs on the ORLTA claims, an order directing defendants to bear the costs of class notice, the court's order striking defendant's "good faith" affirmative defense, and the attorney fee award. In separate briefing, B & J and Berman assert seven assignments of error arising from the piercing trial.

Because we conclude that the trial court erred as to several of its legal rulings that occurred early in the litigation, we reverse and remand the general judgment for further proceedings. Specifically, we conclude that the trial court erred (1) in certifying a 10-year class for plaintiffs' claims under ORS 90.315(4) (2011), a ruling which was based on the court's conclusion that a discovery rule applied to the statute of limitations for plaintiffs' ORLTA claims, ORS 12.125, as described in BBM's second assignment of error; (2) in granting partial summary judgment to plaintiffs on the issue of BBM's liability under ORS 90.315(4) (2011) for its rate billing practices, a ruling that was due to the court's conclusion that BBM violated ORS 90.315(4) (2011) as a matter of law when it charged tenants a higher kilowatt-per-hour (kWh) rate for electricity than the electricity utility had charged BBM, as described in BBM's first assignment of error; and (3) in granting partial summary judgment to plaintiffs on the issue of damages under ORS 90.315(4) (2011) based on its erroneous interpretation of the damages provision in ORS 90.315(4)(e) (2011), as described in BBM's seventh assignment of error.

We also write to address several rulings that we conclude were not erroneous—specifically, the court's grant of partial summary judgment to plaintiffs on the issue of BBM's liability under ORS 90.315(4) (2011) for its "meter reading fee," a ruling which was based on its conclusion that BBM's $10 meter reading fee violated ORS 90.315(4) (2011) as a matter of law, as described in BBM's second assignment of error, and the court's grant of partial summary

judgment to plaintiffs on their retaliation claim, a ruling which was based on the court's conclusion that BBM's rent increase constituted retaliation under ORS 90.385 as a matter of law, as described in BBM's fifth assignment of error. We also conclude that, to the extent that the court erred as alleged in BBM's sixth assignment of error in striking BBM's good faith defense, any error was harmless for the reasons explained below. BBM's eighth assignment of error, which asserts that the trial court erred in granting partial summary judgment to plaintiffs on the issue of calculating retaliation damages under ORS 90.375, is undeveloped in part and unpreserved in part, as explained in greater detail below, and we thus reject it. BBM's third assignment of error depends on the argument that the court erred in granting partial summary judgment to plaintiffs on any theory of BBM's liability under ORS 90.315(4) (2011), and we reject that assignment of error because we reject the argument it depends on. BBM's fourth assignment of error is mooted by our conclusion that the trial court erred in certifying a 10-year class. Thus, we do not further discuss BBM's third and fourth assignments of error.

We also do not address the assignments of error raised by defendants B & J and Berman that pertain to the piercing trial that followed the court's legal rulings addressed above, because we are not persuaded that those issues would necessarily arise in the same way and with the same factual evidence on remand. We reverse the general judgment in this case due to other legal errors, returning this case to a posture that existed well before the piercing trial occurred. On remand, BBM's ultimate liability to plaintiffs will be significantly reduced, and assuming that plaintiffs still pursue a piercing claim under those circumstances, the issues presented to the court may be markedly different as well.

Finally, we do not address BBM's ninth assignment of error regarding plaintiffs' attorney fee award. We reverse the court's supplemental judgment as a matter of law because we are reversing the general judgment to which that supplemental judgment applies. *See* ORS 20.220(3)(a) ("[w]hen an appeal is taken from a judgment under ORS 19.205 to which an award of attorney fees or costs and disbursements

relates[, i]f the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed").

Because BBM's assignments of error implicate varying standards of review as to the facts, we do not provide facts relevant to the litigation as a whole, but instead detail any facts relevant to a given assignment of error within our discussion of that issue. BBM's assignments of error do not track the chronological development of the litigation in the trial court, and we do not attempt to address each assignment in precise chronological order either. Instead, we organize our discussion into the three main overarching topics at issue in BBM's appeal. We begin with the court's class certification ruling, in which the court applied a discovery rule to the one-year statute of limitations in ORS 12.125. We then address the court's summary judgment rulings on liability and damages for plaintiffs' utility billing claims under ORS 90.315(4) (2011). Lastly, we address the court's summary judgment and ORCP 21 E(2) rulings relevant to plaintiffs' retaliation claim under ORS 90.385 and BBM's affirmative defense thereto.

## I.   ORS 12.125 STATUTE OF LIMITATIONS AND BBM'S SECOND ASSIGNMENT OF ERROR

We begin by addressing BBM's contention that the trial court erred when it certified a 10-year class for plaintiffs' utility billing claims, a ruling which depended on the court's conclusion that the one-year statute of limitations for ORLTA claims, ORS 12.125, includes a discovery rule that tolls the limitation period until a tenant knew or reasonably should have known that they had a cause of action under the ORLTA. That argument constitutes the bulk of BBM's second assignment of error.[3] We review the trial court's ruling for errors of law. *Waxman v. Waxman & Associates, Inc.*, 224 Or App 499, 503, 198 P3d 445 (2008).

_____

[3] BBM also raises the argument that, if we conclude that the trial court erred in ruling that BBM violated ORS 90.315(4) (2011), we must also reverse the class certification decision, because the court's "incorrect view" of ORS 90.315(4) (2011) "necessarily drove its conclusion that class treatment was appropriate." We reject that argument because we conclude, as discussed later in our opinion, that the trial court did not err in granting partial summary judgment to plaintiffs based on its conclusion that BBM's meter fee violated ORS 90.315(4) (2011).

The only relevant facts are procedural. In the trial court, the parties agreed that ORS 12.125 set a one-year limitations period applicable to plaintiffs' ORLTA claims but disagreed on whether ORS 12.125 incorporated a discovery rule. While plaintiffs contended that their ORLTA claims were subject to a discovery rule, BBM contended that they were not and asserted that plaintiffs "should be barred from bringing their [O]RLTA claims and defining any alleged class for the [O]RLTA claims for any period of time greater than [one] year prior to the filing of the complaint."

After briefing and argument on the issue, the trial court issued a letter opinion in which it stated that the requirements for class certification had been met and that a discovery rule applied to toll the applicable statute of limitations. However, the court relied on ORS 12.110(1), a provision applicable to tort claims that neither party had cited as controlling. In its later order certifying a 10-year class for the electricity billing claims, the court restated that "[t]he statute of limitations applicable to the ORLTA claims is one year pursuant to ORS 12.125" and "[t]he discovery rule shall apply to toll the applicable statute of limitations relating to the ORLTA."

On appeal, the parties reprise their arguments made to the trial court below. BBM contends that the text, context, and legislative history of ORS 12.125 "support the argument that the legislature did not intend for ORS 12.125 to embody a discovery rule." Plaintiffs contend the opposite.

"The existence of a discovery rule cannot be assumed, but rather must be embodied in the applicable statute of limitations." *Rice v. Rabb*, 354 Or 721, 726, 320 P3d 554 (2014). Thus, the parties' arguments present a question of statutory interpretation to which we apply our familiar methodology, considering the text, context, and any relevant legislative history we deem helpful. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We apply that methodology to determine whether the legislature intended to incorporate a discovery rule in ORS 12.125, and thus begin by examining the text and context of that statute as well as any case law previously interpreting it. *Rice*, 354 Or at 726.

We begin with the statute at issue. ORS 12.125 states that "[a]n action arising under a rental agreement or ORS chapter 90 shall be commenced within one year." On its face, then, nothing in the plain text of ORS 12.125 states explicitly that the legislature intended for that limitations period to begin when the plaintiff discovers or should have discovered the harm, rather than when the facts necessary for the plaintiff to prove their claim have occurred. We have generally stated that, "when the legislature intends to subject a statute of limitations to a discovery rule, it knows how to make its intent to do so clear." *Waxman*, 224 Or App at 511; *see also, e.g.*, ORS 12.135(3)(a)(A) (providing that specified actions must be commenced before the earliest of two years "after injury or damage is first discovered or in the exercise of reasonable care should have been discovered").

However, "the absence of an express discovery provision * * * is not dispositive." *Rice*, 354 Or at 730 (listing cases where the Supreme Court applied a discovery rule absent explicit language). Notably, the Supreme Court has interpreted the word "accrue" to incorporate a discovery rule in many circumstances. *Id.* at 728. As a result, case law establishes that tort claims generally "accrue" when the "plaintiff obtain[s] knowledge, or reasonably should have obtained knowledge of the tort committed upon her person by defendant." *Berry v. Branner*, 245 Or 307, 316, 421 P2d 996 (1966).

Plaintiffs first defend the trial court's ruling by contending that the plain language of ORS 12.125 includes a discovery rule via "accrual" language. As we understand it, plaintiffs assert that, in specifying that ORS 12.125 applies to "[a]n action *arising* under a rental agreement or ORS chapter 90," the legislature intended for the term "arising" to function as "accrual" language that communicated a discovery rule. (Emphasis added.) That argument appears to rely on the *Berry* opinion's definition of the word "accrue" as "*to arise*, to happen to come into force or existence." 245 Or at 311-12 (emphasis added). Plaintiffs further claim that our opinion in *Abraham v. Kendall*, 69 Or App 341, 686 P2d 428 (1984), already established that ORS 12.125 includes "accrual" language that incorporates a discovery rule.

We reject that argument. In specifying that "[a]n action arising under a rental agreement or ORS chapter 90 shall be commenced within one year," ORS 12.125 uses the word "arising" as part of the phrase "arising *under*." (Emphasis added.) That phrase designates the variety of claims to which the statute is applicable—those arising from a breach of a rental agreement or a violation of ORS chapter 90. As used here, the word "arise" means "to originate from a specified source." *Webster's Third New Int'l Dictionary* 117 (unabridged ed 2002); *see also Waldner v. Stephens*, 345 Or 526, 540, 200 P3d 556 (2008) ("Combining the ordinary meaning of 'arise' ('to originate from a specified source,' 'to come into being') and 'under' ('in accordance with'), we think that the phrase 'action arising under a rental agreement or [the ORLTA]' is most naturally read as applying when the action itself is authorized by, or brought in accordance with, one of those two sources." (Footnotes and emphasis omitted.)).

Further, our opinion in *Abraham* does not support plaintiffs' argument. That case involved an alleged oral contract in which the plaintiff agreed to lease a space in defendant's mobile home park on a month-to-month basis and the defendant agreed to obtain certain county permits for the plaintiff. 69 Or App at 343. The discussion in *Abraham* that plaintiffs cite does not address whether a discovery rule applies to ORS 12.125—although we framed the issue as when the plaintiff's cause of action "accrued," our discussion was clearly focused on determining when the defendant breached the alleged oral contract to obtain the permits, and we did not discuss or consider whether a discovery rule applied to the claim. *Id.* at 346. That approach was consistent with the well-settled principle that "a contract claim accrues on breach." *Waxman*, 224 Or App at 512; *see also Romero v. Amburn*, 323 Or App 410, 415, 523 P3d 1135 (2022) (summarize the case law supporting that principle going back "more than 50 years").[4] In other words, *Abraham*

---

[4] In *Romero*, we recently reaffirmed the rule that a breach of contract action accrues at the time of breach, even while acknowledging that the rule might appear inconsistent with some of the reasoning in the Supreme Court's opinion in *Rice*. *See* 323 Or App at 421 ("contract actions 'accrue' at the time of breach, * * * even if most other types of actions 'accrue' when the plaintiff knew or reasonably should have known of the wrong, under the reasoning of *Rice*").

does not support plaintiffs' contention that ORS 12.125 contains "accrual" language that implicates a discovery rule.

Plaintiffs next contend that ORS 12.125 is subject to a discovery rule by operation of ORS 12.010, and that contention presents a closer issue. Our precedent establishes that, even when a statute of limitations does not contain a discovery rule on its face, the statute may incorporate a discovery rule by operation of ORS 12.010, the introductory statute to ORS chapter 12. *See Rice*, 354 Or at 728, 730. ORS 12.010 states that "[a]ctions shall only be commenced within the periods prescribed" in ORS chapter 12, "after the cause of action shall have *accrued*, except where a different limitation is prescribed by statute." (Emphasis added.) A claim "accrue[s]" under ORS 12.010 when the "plaintiff obtained knowledge, or reasonably should have obtained knowledge" of the claim. *Rice*, 354 Or at 728.

In *Rice*, the Supreme Court determined that ORS 12.010 may attach a discovery rule to other ORS chapter 12 statutes of limitations that lack language specifying when the limitations period begins to run. *Rice*, 354 Or at 728. There, the court considered ORS 12.080(4), the statute of limitation for conversion and replevin claims, which declares only that such actions "shall be commenced within six years." The court concluded that ORS 12.080(4) did "not specify when the limitation begins to run" and therefore "f[ell] under the purview of ORS 12.010." *Rice*, 354 Or at 728. As a result, the court read ORS 12.080(4) and ORS 12.010 together to require that relevant actions be commenced within six years from the point in time when the action "accrued" pursuant to ORS 12.010, or when "plaintiff obtained knowledge, or reasonably should have obtained knowledge of the tort committed upon her person by a defendant." *Id*. In the years since *Rice*, we have attached the discovery rule in ORS 12.010 to a number of other statutes of limitations in ORS chapter 12 by following the same analysis. *See Hayes Oyster Co. v. DEQ*, 316 Or App 186, 200, 504 P3d 15 (2021), *rev den*, 369 Or 507 (2022) (attaching discovery rule in ORS 12.010 to limitation period in ORS 12.140); *Hammond v. Hammond*, 296 Or App 321, 334, 438 P3d 408 (2019) (attaching discovery rule in ORS 12.010 to 12.050); *Tavtigian-Coburn v. All Star Custom Homes, LLC*,

266 Or App 220, 222, 337 P3d 925 (2014) (attaching discovery rule in ORS 12.010 to 12.080(3)).

Discerning whether ORS 12.010 attaches a discovery rule to ORS 12.125 seems like a simple question on first blush. ORS 12.125 is a statute of limitations in ORS chapter 12, and it does not contain language specifying when the limitations period begins to run, directing only that "[a]n action arising under a rental agreement or ORS chapter 90 shall be commenced within one year." By its plain language, ORS 12.125 is similar to other statutes of limitations that include a discovery rule by operation of ORS 12.010. *See* ORS 12.050; ORS 12.080(3) - (4); ORS 12.140.

However, defendant correctly observes that ORS 12.125 was placed in ORS chapter 12 by the Office of Legislative Counsel. *See Vollertsen v. Lamb*, 302 Or 489, 495-96, 732 P2d 486 (1987) (explaining that ORS 12.125 was originally passed as Senate Bill (SB) 159, section 39 (1973)—part of the same bill that codified the original ORLTA in ORS chapter 90—but that "[d]uring the process of compilation for inclusion in the Oregon Revised Statutes, Legislative Counsel moved this section to chapter 12"). Proceeding from that fact, defendant argues that there is no evidence that the *legislature* intended for ORS 12.125 to be codified in ORS chapter 12, and therefore no evidence that the legislature intended for ORS 12.010 to apply a discovery rule to ORS 12.125. In response, plaintiffs contend that, "[i]f the legislature did not intend ORS 12.125 to be treated as a 'period prescribed in' ORS chapter 12 per ORS 12.010, it could have indicated so or moved it back to ORS chapter 90." Because the legislature never amended ORS 12.125 in such a way despite opportunities to do so, plaintiffs contend that "ORS 12.125 is on equal footing with the other statutes of limitation contained in ORS chapter 12."

We note first that the lack of legislative action moving ORS 12.125, or otherwise amending its language, is not particularly compelling evidence that the legislature intended for ORS 12.010 to attach a discovery rule to ORS 12.125. *See Berry*, 245 Or at 311 ("Legislative inaction is a weak reed upon which to lean in determining legislative

intent."). However, we understand plaintiffs to essentially contend that the legislative history of ORS 12.125 is insufficient to overcome our case law that ORS 12.010 applies a discovery rule to ORS chapter 12 statutes of limitations that look like ORS 12.125. Indeed, recent cases applying ORS 12.010 to other statutes of limitations have not analyzed how those statutes came to be codified in ORS chapter 12; it was enough that they simply were statutes of limitations in ORS chapter 12 that lacked "triggering event" language. *See, e.g.*, *Hayes Oyster Co.*, 316 Or App at 200 ("Because the catch-all statute, ORS 12.140, falls within the scope of ORS 12.010, we regard the discovery rule applicable." (Footnote omitted.)).

Despite those factors, however, a review of the legislative history of ORS 12.125 leads us to conclude that the legislature did not intend for ORS 12.010 to apply a discovery rule to ORS 12.125. To explain why, we summarize the legislative history of both statutes. We start by considering ORS 12.010, which predated the enactment of the ORLTA and ORS 12.125.

ORS 12.010 has roots as one of Oregon's oldest statutes. The statute that would become ORS 12.010 was first passed during the Second Legislative Assembly in 1862 and was part of the first Code of Civil Procedure. An Act to Provide a Code of Civil Procedure, Or Laws 1862, ch 1, title II, § 3, *compiled in* General Laws of Oregon, Civ Code, ch 1, title II, § 3, p 140 (Deady 1845-1864) ("Actions at law shall only be commenced within the periods prescribed in this title, after the cause of action shall have accrued; except where, in special cases a different limitation is prescribed by statute.").[5] It has remained largely unchanged ever since. *See Rice*, 354 Or at 726 n 7 (although ORS 12.010 has "undergone slight modification and renumbering" since 1862, "the relevant operative text remains the same"). Chapter I, title II of the original Code of Civil Procedure was organized in much the same way as today's ORS chapter 12—section 3

---

[5] It appears that the 1862 law was largely derived from an earlier territorial version. *See* Statutes of Oregon 1854, Act for the Limitation of Actions, ch 1, § 1, p 170 ("actions shall only be commenced within the periods prescribed in this chapter, after the cause of action shall have accrued, except when in special cases a different limitation is prescribed by statute").

introduced the title, then various provisions defined the limitation periods for certain categories of actions. Like ORS 12.010, many of those first statutes of limitations remain largely the same today. *See*, *e.g.*, General Laws of Oregon, Civ Code, ch 1, title II, § 6(2), p 141 (Deady 1845-1864) (defining a six-year limitation period for actions "upon a liability created by statute, other than a penalty or forfeiture," today codified as ORS 12.080(2)); General Laws of Oregon, Civ Code, ch 1, title II, § 6(4), p 141 (Deady 1845-1864) (defining a six-year limitation period for actions "for taking, detaining or injuring personal property, including an action for the specific recovery thereof," today codified as ORS 12.080(4)). Thus, when the legislature originally created the predecessor to ORS 12.010 stating that actions "shall be commenced within the periods prescribed in this title," it intended for that provision to apply to the statutes of limitations in chapter I, title II of the same act. Although the legislature surely contemplated that new statutes of limitations could become part of title II due to future lawmaking, section 3 originally applied to a set collection of statutes of limitations.

With that in mind, we turn to ORS 12.125. ORS 12.125 was first passed in 1973 as part of SB 159, which created the ORLTA. When the bill was first introduced, however, it did not contain a statute of limitations provision applicable to the causes of action the bill created. The Senate Committee on Local Government and Urban Affairs amended the bill to add what became section 39, providing that "[a]n action arising under sections 1 to 35 of this Act shall be commenced within one year." *See* Exhibit 1, Senate Local Government & Urban Affairs Committee, SB 159, March 26, 1973 (memorandum and adopted amendments to SB 159). The House Committee on Local Government and Urban Affairs later adopted an amendment to extend the statute to also cover actions under a rental agreement. *See* Minutes, House Local Government & Urban Affairs Committee, SB 159, June 1, 1973, 4-5 (adopting proposed amendments dated May 18, 1973). In its final form, section 39 stated: "An action arising under a rental agreement or sections 1 to 33 of this Act shall be commenced within one year." Or Laws 1973, ch 559, § 39.

The legislative history to SB 159 contains little background on the provision, presumably because it was part of a much larger bill. The record notes only that section 39 institutes a "short" one-year limitations period and "was added at the suggestion of Senator John Burns [to] prevent landlords and tenants from dragging out ancient history in a dispute between them." Explanation of Engrossed SB 159, House Local Government & Urban Affairs Committee, SB 159, May 18, 1973, 8. We see no indication that the legislature ever discussed whether a discovery rule would or should apply.

Most of the ORLTA created new provisions of law, and although there is some evidence that legislators may have expected that the act would "replace" the existing landlord-tenant provisions in ORS chapter 91, the final act did not specify that any of the provisions were "added to and made a part of" any preexisting chapter. *See* Exhibit 2, Senate Local Government & Urban Affairs Committee, SB 159, Mar 20, 1973 (memorandum on proposed amendments to SB 159) (explaining that the act "would replace ORS [chapter] 91"); Or Laws 1973, ch 559 (specifying only that act "creat[es] new provisions"). This is important, because the legislature knew how to specify that a provision should be added to and made a part of a certain chapter or series, yet did not take that action here. *See, e.g.*, Or Laws 1973, ch 694, § 21 (in legislation from same year, specifying that "[s]ections 22 to 25" of act relating to parole procedures "are added to and made a part of ORS 144.310 to 144.400"); Or Laws 1971, ch 285, § 1 (specifying that "[s]ection 2" of act relating to *ad valorem* taxation "is added to and made a part of ORS chapter 307").

It then fell upon the Office of Legislative Counsel to codify the new law into the Oregon Revised Statutes. *See* ORS 173.160 (explaining that Legislative Counsel "prepar[es] editions of the statutes for publication and distribution"). As part of its statute preparation duties, Legislative Counsel may renumber or rearrange sections so long as those changes do "not alter the sense, meaning, effect or substance of any Act." ORS 173.160. Absent direction from the legislature that the provisions were "added to and made a part of" any

specific chapter or series, Legislative Counsel codified most of the new Act in ORS chapter 91 (which was later renumbered to ORS chapter 90) but codified the statute of limitations provision into ORS chapter 12. *See Vollertsen*, 302 Or at 495-96 (explaining that history).

Thus, there is no evidence that the legislature intended for the ORLTA statute of limitations to be codified in ORS chapter 12 or subject to the discovery rule in ORS 12.010. Not only did the legislature know how to make such an intent clear, but it had also used the required language to explicitly add another statute of limitations to ORS chapter 12 in the prior legislative session. *See* Or Laws 1971, ch 664 (specifying that sections that later became the original version of ORS 12.135 "are added to and made a part of ORS 12.070 to 12.260"). In the case of ORS 12.135, including the "added to and made a part of" language means that ORS 12.135 is part of ORS chapter 12 for purposes of other provisions that broadly apply to ORS chapter 12. Here, the legislature could have made ORS 12.125 subject to ORS 12.010 by using the "added to and made a part of" convention but took no such action.

Because the placement of the ORLTA statute of limitations in ORS chapter 12 was the result of an organizational decision by Legislative Counsel, and not legislative action adding the statute to and making it a part of ORS chapter 12, we cannot draw any legislative intention from the placement of ORS 12.125 within ORS chapter 12. Legislative Counsel cannot "alter the sense, meaning, effect or substance of any Act." ORS 173.160. Legislative Counsel's editorial actions in assigning an enacted law an ORS number within a certain chapter does not mean that the law is therefore subject to other general provisions that apply to that chapter; that sort of effect, when it occurs, must be the result of legislative action. *See State v. Burris*, 370 Or 339, 354 n 10, 518 P3d 891 (2022) ("A statute has the effect of falling within a series only if the legislature says that it falls within the series."). Thus, we conclude that ORS 12.125 is not affected by the language in ORS 12.010 applicable to limitations "periods prescribed in this chapter."

Finally, we conclude that *Rice* and its progeny do not mandate that *any* statute of limitations in ORS chapter 12 that lacks triggering language is subject to a discovery rule by operation of ORS 12.010, regardless of other factors. *Rice*, *Tavtigian-Coburn*, *Hammond*, and *Hayes Oyster Co.* all involved statutes of limitations that were part of the 1862 Code of Civil Procedure that first enacted the predecessor to ORS 12.010. *See Rice*, 354 Or at 723 (applying discovery rule in ORS 12.010 to ORS 12.080(4), formerly chapter I, title II, section 6(4) of 1862 Code); *Hayes Oyster Co.*, 316 Or App at 200 (applying discovery rule in ORS 12.010 to 12.140, formerly chapter 1, title II, section 11 of 1862 Code); *Hammond*, 296 Or App at 334 (applying discovery rule in ORS 12.010 to 12.050, formerly chapter 1, title II, section 4(1) of 1862 Code); *Tavtigian-Coburn*, 266 Or App at 222 (applying discovery rule in ORS 12.010 to 12.080(3), formerly chapter 1, title II, section 6(3) of 1862 Code). The legislature's intent for those statutes of limitations to be subject to and interact with ORS 12.010 was clear. In other words, *Rice* and its progeny do not imply that the question whether ORS 12.010 attaches a discovery rule to a certain statute of limitation is determined only by where the statute was codified and whether it lacks relevant triggering language. As to a statute like ORS 12.125, the lack of any legislative intent for the statute to be added to and made a part of ORS chapter 12 controls over those other considerations.

For those reasons, we conclude that a discovery rule does not apply to ORS 12.125. In the absence of a discovery rule, a limitations period begins to run when every fact necessary for the plaintiff to prove the elements of their claim has occurred and the plaintiff has a right to sue. *See Stupek v. Wyle Laboratories Corp.*, 327 Or 433, 438, 963 P2d 678 (1998) (so stating). As to plaintiffs' ORS 90.315(4) (2011) claims that fall under the one-year statute of limitations in ORS 12.125, the limitations period began to run when the relevant billing violations occurred. Thus, the trial court erred in certifying a 10-year class for plaintiffs' claims under ORS 90.315(4) (2011).[6]

---

[6] We do not address plaintiffs' contention that defendant should be "estopped" from asserting a statute of limitations defense, because we conclude that plaintiffs did not present that argument in the trial court or request our consideration of the argument under our "right for the wrong reason" doctrine.

## II.   PLAINTIFFS' ORS 90.315(4) (2011) CLAIMS
## AND BBM'S FIRST AND SEVENTH
## ASSIGNMENTS OF ERROR

A.  *BBM's Liability under ORS 90.315(4) (2011) and First Assignment of Error*

We next address BBM's first assignment of error, in which it contends that the trial court erred "when it granted summary judgment to plaintiffs on their ORS 90.315(4) [(2011)] claims." That ruling was based on the trial court's legal conclusions that (1) to the extent that BBM charged residents a higher kWh rate for electricity than BBM was billed by the utility provider, Portland General Electric (PGE), that practice violated ORS 90.315(4) (2011); and (2) BBM's practice of charging residents a meter reading fee violated ORS 90.315(4) (2011). On review, we view the evidence, and all reasonable inferences that may support it, in the light most favorable to BBM as the nonmoving party to determine whether there are any genuine issues of material fact and whether plaintiffs were entitled to judgment as a matter of law. *Day v. Day*, 299 Or App 460, 461, 450 P3d 1 (2019). In so doing, we first conclude that the trial court erred in granting summary judgment to plaintiffs on their rate claim, as plaintiffs were not entitled to judgment as a matter of law on that claim. However, we conclude that the trial court did not err in granting plaintiffs' summary judgment motion on the meter reading claim.

We take the relevant facts from the summary judgment record.[7] BBM operated a 158-site recreational vehicle (RV) park in Salem. The park's rental agreements with its residents varied, but stated either that residents were responsible for "electric" or "Electric As Used," depending on the specific tenant and when they signed their agreement, as an extra charge paid to BBM each month in addition to rent. Prior to the filing of plaintiffs' complaint, those agreements did not explain how electricity charges would be calculated or disclose fees for meter reading.

---

[7] We note that plaintiffs have directed our attention to materials that were not in the record at the time the trial court considered plaintiffs' motion for summary judgment. We consider only the evidence that was in the record at the pertinent time, viewed in the light most favorable to BBM.

Each of the park's 158 sites were separately metered for electrical service by individual meters that were owned by BBM. Approximately six to 12 individual site meters fed into one PGE-owned submeter, and a total of 16 PGE-owned submeters serviced all 158 sites at the park. PGE billed BBM monthly for the electricity delivered to each PGE-owned submeter at a kWh rate that "varie[d] each month, and varie[d] monthly between the submeters." BBM contended that PGE's rates ranged from $0.09 to $0.12 per kWh during the relevant time period.

BBM, in turn, billed residents on a monthly basis for the electricity used at individual tenant sites. BBM's process for determining tenant electricity bills involved the park's maintenance worker reading each individual site meter monthly and computing the electricity used by subtracting the prior month's meter reading from the current month's reading. Once the kWh usage for the month was computed, that number was multiplied by "the current kWh rate." Finally, a $10 "meter fee" was added to reach the total tenant electricity charge amount. The meter fee was intended to cover BBM's costs "associated with reading the meters, the costs associated with installing the individual tenant site meters, lines and pedestals as well as the repairs and upkeep for the individual tenant meters."[8]

The "current kWh rate" that BBM charged its residents was not the current rate PGE charged BBM for electricity for the relevant month or submeter, but instead a $0.12 "flat kWh rate" set by the park. BBM contended that the different billing periods used by PGE and the park, the different kWh rates assessed by PGE for different submeters, and the different kWh rates assessed by PGE from month to month combined to make computing each resident's electrical fee based on the actual kWh rate PGE charged for the resident's usage "an administrative and accounting burden [that] would result in a high likelihood of error in the calculations."

---

[8] Plaintiffs contend on appeal that this fee was instead intended to recoup a PGE "basic charge." Plaintiffs' contention is not supported by the relevant summary judgment record or consistent with our standard of review to view the evidence in the light most favorable to BBM.

BBM's flat kWh rate was reviewed annually by analyzing the total amount billed to BBM by PGE for the 16 submeters in the previous year and the total amount paid by residents for electricity in that year. Despite the higher rate, the park did not make a profit on electricity, apparently because each PGE meter recorded more electricity use in kilowatt hours than the total of all the individual submeters that fed into it. Although the parties disputed the reason for that discrepancy, they agreed that it existed. BBM "attempt[ed] to lose a slight amount of money each year" and had a "longstanding policy to charge its tenants slightly less for their electricity expenses" than what BBM was charged by PGE.

In the trial court, plaintiffs moved for partial summary judgment on two legal issues central to its ORS 90.315(4) (2011) claims: that charging tenants a higher kWh rate than BBM was billed by the utility and charging a meter reading fee both violated ORS 90.315(4) (2011) as a matter of law. BBM contended that neither did. Specifically, BBM contended that ORS 90.315(4) (2011) did not require it to bill tenants the same kWh rate as PGE had billed BBM and instead only required that "the landlord does not make a profit" on electricity. As to the meter reading fee, BBM contended that ORS 90.315(4) (2011) was not relevant to the charge at all because it was for BBM's services "in accounting for the electricity used by the tenant." After receiving briefing and argument, the trial court granted plaintiffs' motions. The parties essentially repeat their summary judgment arguments on appeal.[9]

Whether the inflated kWh rate and "meter fee" billing practices at issue in this case violated ORS 90.315(4) (2011) as a matter of law are questions of statutory interpretation for which we again turn to the familiar framework laid out in *Gaines*, 346 Or at 171-72, beginning with the relevant statute. ORS 90.315 (2011) defines a "[u]tility or

_____

[9] We do not address plaintiffs' arguments that rely on evidence that was not part of the summary judgment record. As we discuss further below, we also do not consider arguments plaintiffs make for the first time on appeal that rely on a section of the ORLTA relevant to manufactured dwellings and floating homes, both because plaintiffs did not bring their claims under those statutes and because the parties agreed below that those statutes did not apply to BBM's RV park.

service," as used in the statute, specifying that it "includes but is not limited to electricity, natural or liquid propane gas, oil, water, hot water, heat, air conditioning, cable television, direct satellite or other video subscription services, Internet access or usage, sewer service and garbage collection and disposal." ORS 90.315(1)(b) (2011). ORS 90.315(4) (2011) then addresses certain landlord obligations regarding utility billing. It states, in part:

> "(a)   Except for tenancies covered by ORS 90.505 to 90.840, if a written rental agreement so provides, a landlord may require a tenant to pay to the landlord *a utility or service charge that has been billed by a utility or service provider to the landlord for utility or service provided directly to the tenant's dwelling unit* or to a common area available to the tenant as part of the tenancy. A utility or service charge that shall be assessed to a tenant for a common area must be described in the written rental agreement separately and distinctly from such a charge for the tenant's dwelling unit. Unless the method of allocating the charges to the tenant is described in the tenant's written rental agreement, the tenant may require that the landlord give the tenant a copy of the provider's bill as a condition of paying the charges.

> "(b)   Except as provided in this paragraph, *a utility or service charge may only include the cost of the utility or service as billed to the landlord by the provider.* A landlord may add an additional amount to a utility or service charge billed to the tenant if [the charge is for certain cable, satellite, video, or internet services not relevant here.]"

ORS 90.315(4) (2011) (emphases added).

        We first consider the inflated kWh rate billing issue. Pursuant to ORS 90.315(4)(a) (2011), because BBM's rental agreements provided that residents were responsible for "electric" or "Electric As Used" (depending on the rental agreement at issue), BBM could require a resident to pay a "utility or service charge" that had been billed by PGE to BBM for electricity (a "utility") "provided directly to the tenant's [RV site or] dwelling unit." *See* ORS 90.100(12) ("'Dwelling unit' regarding a person who rents a space for a *** recreational vehicle *** means the space rented ***."). And, pursuant to ORS 90.315(4)(b) (2011), that "utility or

service charge" could "only include the cost" of the electricity "as billed" by PGE to BBM. ORS 90.315(4) (2011) does not mandate that a landlord charge the exact same *rate* it is billed by a utility—instead, the landlord is only required to charge the exact same "*cost*." The "cost" of something is generally "the amount or equivalent paid or given or charged or engaged to be paid or given for anything bought or taken in barter or for service rendered : CHARGE, PRICE." *Webster's* at 515. Here, the kWh rate PGE charged to BBM for resident site electricity was but one component of the overall cost charged.

The legislative history of ORS 90.315(4) (2011) supports that reading. The provision was first passed in 1997 as part of legislation that created new statutes and amended large swaths of the ORLTA. *See* Or Laws 1997, ch 577, § 16. According to the bill's principal drafter, John Van Landingham, the utility provisions at issue here were intended to ensure that "the landlord cannot *add on to the charge*" or "include any capital costs incurred by a landlord, such as installing a water system." Exhibit O, House Commerce Committee, SB 675, May 29, 1997, 8 (accompanying comments by Van Landingham) (emphasis added). In subsequent years, the provision was subject to minor changes, but the focus remained on ensuring that landlords did not pass on more than the overall "cost" billed by the utility provider.[10]

Further, we reject plaintiffs' arguments that we consider the utility billing provisions in ORS 90.531 to 90.543 (2011) in interpreting ORS 90.315(4) (2011). Those statutes specifically address permissible utility billing methods for manufactured dwellings and floating home space tenancies and do not apply to BBM's RV park. *See* ORS 90.100(25) (2011) ("'Manufactured dwelling' does not include a recreational vehicle."); ORS 90.120(5) (2011) ("Residential tenancies for

---

[10] House Bill (HB) 3098 (1999) amended the original 1997 language that "[a] landlord shall not increase the utility or service charge to the tenant by adding any costs of the landlord, such as a handling or administrative charge, other than those costs billed to the landlord by the provider for utilities or services" to require that "[a] utility or service charge shall include only the value or cost of the utility or service as billed to the landlord by the provider." Or Laws 1999, ch 603, § 18. SB 772 (2009) subsequently changed "should only include the value or cost" to "may only include the cost." Or Laws 2009, ch 816, § 4a.

recreational vehicles *** shall be subject to ORS 90.100 to 90.465."); ORS 90.315(4)(a) (2011) (excepting "tenancies covered by ORS 90.505 to 90.840"). Plaintiffs did not bring their claims under those statutes or raise them below, and the parties in fact agreed in the trial court that ORS 90.505 to 90.840 (2011) did not apply to BBM's RV park.

We are also not persuaded that those statutes provide relevant context for interpreting ORS 90.315(4) (2011). Indeed, those statutes provide specific guidelines for landlord utility billing for those tenancies, limiting landlords who seek reimbursement for utility service costs to three options: (1) including the costs in the rent, (2) separately billing tenants via pro rata apportionment based on a "master meter," or (3) separately billing tenants based on the tenant's actual use as measured by their submeter "at a rate no greater than the average rate billed to the landlord by the utility or service provider, not including any base or service charge." ORS 90.536(1), (2) (2011); ORS 90.532(1) (2011). However, we see no evidence that the legislature intended for those statutes to have any application outside of the manufactured dwelling and floating home tenancies they regulate. *See also* ORS 90.315(4)(a) (2011) (excepting "tenancies covered by ORS 90.505 to 90.840").

In short, ORS 90.315(4)(a) and (b) (2011) ensure that a landlord does not upcharge a tenant for utilities beyond the "cost" that the landlord is billed by the provider. Those provisions do not require that a landlord must charge a tenant the exact same kWh *rate* for electricity that the landlord is itself billed by the utility. Of course, a landlord's use of an inflated kWh rate may lead to tenant bills that exceed the landlord's cost to the provider—in fact, that might be the most likely result of such a practice. But determining whether that is the case would depend on the facts.

In this case, plaintiffs did not allege, or later present facts in the summary judgment record, that BBM's inflated rate billing resulted in electricity charges to tenants that exceeded BBM's cost to PGE for that electricity, in violation of ORS 90.315(4) (2011). Instead, in the operative complaint at the time of their partial summary judgment motion, plaintiffs only alleged that BBM violated

ORS 90.315(4) (2011) when it "charged plaintiffs and class members a rate per kilowatt hour for electricity that was in excess of the rate defendants paid to PGE." Because, as we concluded above, an inflated rate billing practice is not alone sufficient to violate ORS 90.315(4) (2011) as a matter of law, the trial court erred in granting partial summary judgment to plaintiffs on their rate claim.

We reach a different conclusion as to BBM's practice of adding a $10 "meter fee" or "meter reading fee" into tenant electricity charges, however. Again, under ORS 90.315(4) (2011), "a landlord may require a tenant to pay to the landlord a utility or service charge that has been billed by a utility or service provider to the landlord for utility or service provided directly to the tenant's dwelling unit," and a utility charge for electricity "may only include the cost of the utility or service as billed to the landlord by the provider." ORS 90.315(4)(a), (b) (2011). As we understand it, BBM's argument is that ORS 90.315(4) (2011) "does not prohibit or even address the meter fee" to recoup BBM's capital and administrative electrical costs, because, in BBM's view, the fee was not for PGE's electricity "provided directly to the tenant's dwelling unit," but instead, for a service BBM provided.

However, BBM misconstrues the relevant language. ORS 90.315(4) (2011) applies to the meter fee because it was a surcharge that BBM added into residents' monthly electricity charges and not a cost passed on from PGE. BBM required tenants "to pay to the landlord a utility or service charge," or electricity charge, "that ha[d] been billed by a utility or service provider to the landlord." ORS 90.315(4)(a) (2011). That charge was "for utility or service provided directly to the tenant's dwelling unit" *rather than "a common area* available to the tenant as part of the tenancy." *Id.* Thus, BBM's electricity charges to tenants fell under ORS 90.315(4)(b) (2011) and could "only include the cost of the utility or service as billed to the landlord by the provider." However, the charges were not limited as required. BBM added a meter reading fee into the tenant electricity charges to recoup its own capital and labor expenses, expenses which were not part of the "cost" of electricity "as billed" by PGE. That type of surcharge is the precise type of billing practice

that the legislature intended to prevent with ORS 90.315(4) (2011). *See* Exhibit O, House Commerce Committee, SB 675, May 29, 1997, 8 (accompanying comments by Van Landingham) (explaining that "the landlord cannot add on to the charge" or "include any capital costs incurred by a landlord"). Thus, BBM's meter fee violated ORS 90.315(4) (2011), and the trial court did not err in granting summary judgment to plaintiffs on that issue.

B.   *Damages under ORS 90.315(4) (2011) and BBM's Seventh Assignment of Error*

We next turn to the arguments in BBM's seventh assignment of error, in which it contends that the trial court erred in granting plaintiffs' motion for summary judgment on the issue of damages under ORS 90.315(4)(e) (2011). Under that provision, "[i]f a landlord fails to comply with paragraph (a), (b) or (c) of this subsection, the tenant may recover from the landlord an amount equal to one month's periodic rent or twice the amount wrongfully charged to the tenant, whichever is greater." ORS 90.315(4)(e) (2011). Specifically, the court adopted plaintiffs' view that ORS 90.315(4)(e) (2011) provided one month's rent as a remedy for each specific and repeated violation of ORS 90.315(4)(a) to (c) (2011), such that each tenant could receive as much as two month's rent for every month in which they were charged both an inflated kWh rate and meter fee.

We recently rejected that interpretation in *Shepard Investment Group LLC v. Ormandy*, 320 Or App 521, 514 P3d 1125, *rev allowed*, 370 Or 404 (2022). In that case, a landlord had violated two recently created provisions of ORS 90.315(4): ORS 90.315(4)(b)(A), requiring that utility charges are billed to a tenant in writing, and ORS 90.315 (4)(b)(B), requiring that a landlord provide a tenant with a written explanation of the manner in which the utility provider assessed its charges and the manner in which the landlord allocated those charges among the tenants. *Id.* at 524-25. The trial court in *Shepard Investment Group LLC* also concluded that the violations had been repeated every month over the course of a year every time the landlord billed the tenant for utilities absent the required writings. *Id.* Citing the remedy provision now numbered as ORS

90.315(4)(f), the tenant argued that, because the landlord had "fail[ed] to comply with paragraph * * * (b)" 12 separate times, the tenant was entitled to recover "an amount equal to one month's periodic rent or twice the amount wrongfully charged to the tenant, whichever is greater" as a separate remedy for each of those 12 individual violations. *Id.* at 524. The trial court agreed and awarded the tenant an amount equal to 12 months' rent or nearly $10,000. *Id.* at 525.

On the landlord's appeal, we construed the remedy provision and concluded that the legislature had not intended for it to provide "one month's periodic rent or twice the amount wrongfully charged" as a remedy each time a landlord "fail[ed] to comply" with the listed requirements. *Id.* at 530-31. We noted that the plain language of the provision does not specify that it applies on a "per violation" or "per noncompliant billing" basis as the tenant had argued. *Id.* at 531. Instead, the provision provides for the greater of two possible remedies if a tenant establishes that a landlord "fails to comply" with any of the listed requirements, language which plainly does not distinguish between the number of times a landlord violates the requirements. *Id.* at 530-31. However, the provision still provides for an increased remedy when a tenant is "wrongfully charged" on a repeated basis *if* "twice the amount wrongfully charged to the tenant" is greater than "one month's periodic rent." *Id.* at 530. Applying that interpretation to the facts, we concluded that the tenant had been "wrongfully charged" $40 each month over 12 months, because each of those monthly utility charges had failed to comply with ORS 90.315(4)(b). *Id.* at 532. Because twice the total amount wrongfully charged was greater than one month of the tenant's periodic rent, the tenant was entitled to "twice the amount wrongfully charged" or $960. *Id.*

In accordance with our decision in *Shepard Investment Group LLC*, we agree with BBM that the trial court erred in granting partial summary judgment to plaintiffs on the issue of damages under ORS 90.315(4)(e) (2011) and conclude that plaintiffs were not entitled to two months' rent for each month in which BBM violated ORS 90.315(4)(b) (2011). A tenant is not entitled to "an amount equal to one month's periodic rent or twice the amount wrongfully

charged to the tenant, whichever is greater" as a separate remedy for each individual billing over time that fails to comply with ORS 90.315(4)(b) (2011). Regardless of the total number of billings that "fail[ed] to comply" with ORS 90.315(4)(b) (2011), the court should only consider whether BBM "fail[ed] to comply with paragraph *** (b)," and, if the answer is yes, award a tenant "an amount equal to one month's periodic rent or twice the amount wrongfully charged to the tenant, whichever is greater." ORS 90.315(4)(e) (2011). In short, the trial court here erred in granting summary judgment to plaintiffs on the issue of calculating damages under ORS 90.315(4)(e) (2011).

### III. PLAINTIFFS' RETALIATION CLAIM AND BBM'S FIFTH AND SIXTH ASSIGNMENTS OF ERROR

A. *Plaintiffs' Retaliation Claim and BBM's Fifth Assignment of Error*

Next, we consider BBM's fifth assignment of error, in which BBM assigns error to the trial court's ruling granting partial summary judgment to plaintiffs on their retaliation claim. As relevant here, ORS 90.385 prohibits a landlord from retaliating "by increasing rent" after "[t]he tenant has performed or expressed intent to perform any *** act for the purpose of asserting, protecting or invoking the protection of any right secured to tenants under any federal, state or local law." ORS 90.385(1)(f).

The facts relevant to the court's summary judgment ruling, viewed in the light most favorable to BBM, are as follows. In June 2013, approximately two months after plaintiffs filed this action, BBM issued a "30-day Written Notice of Change of Policies and Practices" to all current park residents, explaining that on July 29, 2013, BBM would stop charging tenants a "monthly $10.00 electricity service charge," begin charging tenants a kWh electricity rate that was based on the average kWh rate charged by the utility for each billing cycle, and increase rent for all tenants by $20 per month. The notice stated that "[i]t has recently been brought to our attention that our RV sites are metered with electro-mechanical meters that consistently

read less power used than the PG&E smart meters," that BBM had "been losing money on electricity" for that reason, and that the billing changes were intended "to simplify billings, break even on electricity, and keep total rents down." (Underscoring in original.) The notice ended by stating that "[i]t is our hope that these changes will only affect your monthly billings slightly, if at all." Berman held three different meetings to announce the new billings policies to tenants. At the meetings, Berman explained to the tenants that the changes were "revenue neutral."

Explaining the changes in a later deposition, Berman stated that "attorneys had impact" on his decision to produce the notice and hold the tenant meetings regarding the restructured billing practices and rent increase "specifically right then," but that "the fact that [he] had been sued for charging a meter reading fee" had not been "a factor that went into that decision." Acknowledging that the billing changes made some residents' overall bills increase by "two, three bucks" a month, Berman stated that "I don't know any other way to do it *** [to] be so far above board and compliant that I'm never having this discussion with [plaintiffs' attorney] again." In a later affidavit, Berman added that the park made the billing changes "because it was attempting to be more legally compliant in its practices, because it was engaging in protected settlement discussions, because the park had legitimate business reasons for the restructuring (as reflected in the notice to the tenants about the same) and it was attempting to meet Plaintiffs' ORCP 32 H demands."[11]

Plaintiffs amended their complaint to add an additional claim for retaliation and moved for partial summary judgment on the claim, contending that "conduct admitted to by Defendants—raising rent as a result of the filing of

---

[11] Under ORCP 32 H, potential class action plaintiffs must "[n]otify the potential defendant of the particular alleged cause of action" and "[d]emand that such person correct or rectify the alleged wrong" in writing at least 30 days "prior to the commencement of an action for damages." In turn, a defendant who shows that all potential class members have been reasonably identified and notified that "the defendant will make the appropriate compensation, correction, or remedy of the alleged wrong," makes "[s]uch compensation, correction, or remedy" within a reasonable time, and has or will cease "from engaging in *** such methods, acts, or practices alleged to be violative of the rights of potential class members" may avoid an action for damages. ORCP 32 I.

this lawsuit—constitutes unlawful retaliation under ORS 90.385." Citing *Elk Creek Management Co. v. Gilbert*, 353 Or 565, 303 P3d 929 (2013), plaintiffs contended that they had met the requirements of ORS 90.385 and proved that "the landlord made the decision to act because of the tenant's protected activity." Specifically, plaintiffs pointed to a June 10, 2013 letter from BBM's attorney to plaintiffs' counsel during settlement negotiations and Berman's deposition testimony as proof that BBM had admitted that the lawsuit motivated the rent increase.

In response, BBM argued that plaintiffs had not established retaliation as a matter of law. First, BBM contended that the statute did not apply at all, because the rent increase had accompanied decreases in other fees that made the overall changes "revenue neutral," and because none of the current tenants at the time of the rent increase were yet involved in the litigation—only the Hathaways were named plaintiffs, they no longer resided at the park, and the court had yet to certify a class. BBM also argued that plaintiffs' complaint was not the "but for" cause of the rent increase and that other factors had motivated the changes.

Additionally, BBM pointed to different settlement communication letters, this time those dated May 31 and July 11, 2013, from plaintiffs' attorneys to BBM's counsel, as evidence that plaintiffs had brought their retaliation claim in bath faith. *See* ORS 90.130 ("[e]very duty under this chapter and every act which must be performed as a condition precedent to the exercise of a right or remedy under this chapter imposes an obligation of good faith in its performance or enforcement"). Specifically, BBM argued that plaintiffs

"should not be entitled to the right to enforce ORS 90.385 or be entitled to damages under [ORS] 90.375 as a result of alleged retaliation. Defendants were negotiating with Plaintiffs in good faith pursuant to ORCP 32 H and 32 I at or around the time the Park changed its practices. Additionally, counsel for Plaintiffs assured counsel for Defendants that Defendant was 'free to increase rent' in the present proceeding. In a letter from Counsel to Plaintiffs dated May 31, 2013, which counsel for Plaintiffs filed in support of their Motion for Leave to File its Second

> Amended Complaint to add damages to the proceeding, and in discussing the meter reading fee being dropped, counsel stated: 'My understanding from our discussion is that this fee will be dropped altogether. Obviously, defendant is free to increase rent, or, as I read the statute, disclose and include this charge as an explicit term in any new leases.' Additionally, in June 11, 2013, correspondence from counsel for Plaintiffs, counsel for Plaintiffs stated that they 'welcome[d] implementation of the curative steps outlined in your letter.' (Plaintiffs' June 11, 2013 correspondence was also previously filed in support of its Motion for Leave to File its Second Amended Complaint). In this respect, Plaintiffs through their counsel, acted in bad faith by encouraging the changes proposed by counsel for Defendant through settlement negotiations, and even expressly stated that rent could be raised to address their legal concerns related to the meter reading fee, and then proceeded to file a retaliation claim after the park made its proposed changes."

(Internal citations omitted.) That argument did not fashion ORS 90.130 as an affirmative defense, and BBM had not pleaded ORS 90.130 as an affirmative defenses to the retaliation claim at that time.

Lastly, at the same time that BBM invoked settlement letters from *plaintiffs'* counsel in its arguments, BBM moved to strike the settlement letter from *BBM*'s counsel that plaintiffs had included and referenced in their motion, arguing that it was evidence of statements made in compromise negotiations that was protected and inadmissible under OEC 408 to prove BBM's liability.

After receiving briefing and oral argument, the trial court made its rulings. First, the court granted defendant's motion to strike the letter from BBM's attorneys, concluding that it was inadmissible under OEC 408. The court then granted plaintiffs' motion "to establish liability under ORS 90.385." The court explained:

> "Once the Defendants were no longer able to illegally overcharge tenants for electricity and meter reading fees, they chose to instead increase the rent. It is clear that this action was done in response and because of tenants' filing this lawsuit. As a result, this court finds that Defendants

did in fact violate ORS 90.385 by retaliating when they raised rent by $20.”

In granting the motion, the trial court implicitly concluded that there was no genuine issue as to any material fact and that plaintiffs were entitled to prevail on the claim as a matter of law. *See* ORCP 47 C.

With that background in mind, we summarize the controlling law on this issue. As relevant here, ORS 90.385 prohibits a landlord from retaliating “by increasing rent” after the tenant has “made any complaint to the landlord that is in good faith and related to the tenancy”; “testified against the landlord in any judicial, administrative, or legislative proceeding”; or “performed or expressed intent to perform any other act for the purpose of asserting, protecting or invoking the protection of any right secured to tenants under any federal, state or local law.” ORS 90.385(1). There must be a causal connection between the landlord’s action and the tenant’s protected activity—specifically, the tenant must prove that the landlord made the decision to raise rent *because of* the tenant’s complaint. *Elk Creek Management Co.*, 353 Or at 574, 582. The reason for a landlord’s decision is a question of fact. *Id.* at 584. Typically, the tenant must establish that, “but for” the protected activity, the landlord would not have made the decision to raise rent. *Id.* In the event that multiple factors motivated the decision but either operating alone would have been sufficient to cause it, a tenant may also prevail by proving that the tenant’s protected activity was a “material and substantial factor” in the landlord’s decision. *Id.* at 584-85. In neither instance is the tenant required to prove that the tenant’s protected activity was the “sole” or “dominant” reason for the landlord’s decision. *Id.* at 585. In other words, the tenant’s protected activity need only be “a factor that made a difference in the landlord’s decision.” *Id.* at 583.

We first address BBM’s renewed argument that its rent increase was not retaliatory because no current tenant had asserted protected rights when the rent increase occurred. We reject that argument. The complaint asserted claims on behalf of “a Class consisting of *** [a]ny person who, at any time during the ten[-]year period preceding the

date this lawsuit was filed," had paid electricity bills from BBM that had been computed using the kWh rate and meter fee practices at issue in plaintiffs' ORS 90.315(4) (2011) claims. The complaint made clear that a class that included current tenants intended to pursue class action litigation to assert its rights under the ORLTA, and by the time of the rent increase, at least two current tenants had actually participated in the action by declaring that BBM's ORLTA violations were ongoing. Further, ORS 90.385(5) makes clear that "a complaint made by another on behalf of a tenant is considered a complaint by the tenant" for purposes of ORS 90.385. In that context, current tenants had "expressed intent" to assert their rights.

We are also not persuaded by BBM's contention that the rent increase did not violate ORS 90.385 because it was "revenue neutral." ORS 90.385 states that "a landlord may not retaliate" by taking certain delineated actions, including "increasing rent," after a tenant asserts its ORLTA rights. In short, the legislature chose to prohibit a landlord from responding to tenant complaints by raising rent, without any exception for rent increases as part of other fee restructuring that potentially also lowers other tenant costs.[12]

We also reject BBM's contention that the trial court erred because "[t]here was an issue of fact on good faith." Although plaintiffs did not address this particular argument, both in the trial court and on appeal, we nevertheless conclude that it does not provide BBM with a basis for reversal because it relies on a fundamental misunderstanding of the requirements of ORS 90.130.

As we have said before, the duty of good faith in ORS 90.130 applies to "every act that is a condition precedent to exercising a right or a remedy under the ORLTA." *Lopez v. Kilbourne*, 307 Or App 301, 309, 477 P3d 14 (2020). As relevant here, because a tenant must bring a claim as a condition precedent to recovering a remedy for retaliation

_____

[12] We also reject BBM's contention that the trial court erroneously relied on its earlier conclusions that BBM's inflated kWh rate billing and meter fees violated ORS 90.315(4) (2011) in granting summary judgment to plaintiffs on their retaliation claim. Having reviewed the trial court's ruling, we conclude that the court did not apply an incorrect legal standard or improperly rely on its earlier rulings in ruling on the retaliation claim.

pursuant to ORS 90.385, the tenant is obligated to bring that claim in good faith. *See id.*

Although the ORLTA defines "good faith" as "honesty in fact in the conduct of the transaction concerned," ORS 90.100(19), ORS 90.130 is not so broad as to prohibit plaintiffs' alleged conduct at issue here. The Supreme Court has explained that good faith under the ORLTA has a narrower meaning than the "broader concept of good faith that is frequently found in both statute and common law." *Eddy v. Anderson*, 366 Or 176, 188, 458 P3d 678 (2020). A tenant violates the ORLTA's obligation of good faith with respect to a claim "only if they acted dishonestly with respect to the allegation" in the claim, meaning that they alleged a claim "that they knew to lack merit." *Id.* at 189 ("So long as they subjectively believed that the [claim] had merit, and so long as they did not knowingly fail to comply with any prerequisite for asserting their claim, they were entitled to bring it."). For example, ORS 90.130 prevented tenants in an eviction proceeding who "deliberately" avoided personal service of a termination notice, and who in fact received a notice that was slipped under their door, from enforcing the statutory requirement for personal delivery of the notice. *See Stonebrook Hillsboro, L.L.C. v. Flavel*, 187 Or App 641, 69 P3d 807, *rev den*, 335 Or 656 (2003). The duty of good faith does *not* function to deny a remedy to a tenant who subjectively believes that their claim has merit, but who otherwise engaged in unfair dealing or had "unclean hands" or a "malicious purpose." *Id.*; *see also Lopez*, 307 Or App at 311 (explaining that ORS 90.130 did not bar tenant who lied on rental application from prevailing on defense to a later, unrelated eviction proceeding for nonpayment of rent).

Applying that law to the facts of this case, ORS 90.130 required that plaintiffs bring their retaliation claim in good faith, or with the subjective belief that the claim has merit. For sure, several factual scenarios could have supported an argument that plaintiffs' retaliation claim lacked good faith in its enforcement. As in *Stonebrook Hillsboro, L.L.C.*, plaintiffs could not prevail if they had knowingly prevented or thwarted BBM's attempts to comply with ORS 90.385. ORS 90.130 also barred plaintiffs' recovery if they subjectively believed their claim lacked merit, such as if

they knew that they had never made a protected complaint or if they knew that BBM had raised rent for a reason unrelated to the lawsuit.

None of those circumstances, or any other circumstances that would violate ORS 90.130, are present on these facts. The extent of the record on the issue, viewed in the light most favorable to BBM, was limited to the following: In the first letter dated May 31, 2013, plaintiffs' attorney welcomed BBM's cessation of the meter fee and added that

> "[o]bviously, defendant is free to increase rent, or, as I read the statute, disclose and include [the meter reading fee] as an explicit term in any new leases.

> "Regardless, as long as defendant proposes a solution that complies with the statute and is fair to the class, we will likely agree to it."

In the second letter, plaintiffs' attorney "agree[d] with defendants' proposal" to eliminate the meter fee and welcomed "cessation of the $10 per month charge," if approved by the court, as a part of "implementation of the curative steps outlined in your [June 10, 2013] letter."[13] At most, that evidence could support a finding that plaintiffs encouraged BBM's violation of ORS 90.385 with an improper motive to add more claims, and thus more damages, to their recovery. It does not, however, create an issue of fact as to whether plaintiffs had a good faith belief in the legitimacy of their claim. Again, ORS 90.130 is not so broad as to prohibit recovery by a tenant with unclean hands or malicious purpose, and as in *Lopez*, BBM has not presented an argument as to what "precise duty or condition precedent" plaintiffs were either "performing or enforcing" when they encouraged BBM's retaliatory rent increase in violation of ORS 90.385. 307 Or App at 311. "Without the identification of a duty or an act that is a condition precedent, the statutory duty of good faith does not apply." *Id.* The ORLTA does not condition a tenant's right to bring a claim under ORS 90.385 on a requirement that the tenant not encourage the landlord's violation. Nowhere in the ORLTA are those rights and

---

[13] The reader may recall that BBM successfully blocked admission of the June 10, 2013 letter from BBM's attorney. No other evidence from the settlement negotiations entered the summary judgment record.

duties tied together. As a result, we reject BBM's contention that a question of fact as to whether plaintiffs had acted in good faith precluded the trial court's grant of summary judgment to plaintiffs on their retaliation claim.

Lastly, BBM contends that an issue of fact as to the cause of or motivation behind the rent increase precluded summary judgment. As we explained earlier, a tenant must prove that the tenant's protected activity was a factor that made a difference in the landlord's decision. A tenant is not required to prove that the tenant's protected activity was the "sole" or "dominant" reason for the landlord's decision.

Although the reason for a landlord's decision to raise rent is generally a question of fact, we agree with the trial court that, even viewing the summary judgment record in the light most favorable to BBM and making all reasonable references in its favor, no objectively reasonable jury could conclude that plaintiffs' class-action complaint was not a factor that made a difference in BBM's decision to raise rent. BBM raised rent as part of billing changes that also eliminated the meter fee and inflated kWh rate that were the subject of plaintiffs' claims, changes which occurred only two months after plaintiffs filed their lawsuit. Berman stated that "attorneys had impact" on his decision to make the changes "specifically right then" and opined during deposition that "I don't know any other way to do it *** [to] be so far above board and compliant that I'm never having this discussion with [plaintiffs' attorney] again." Perhaps most importantly, Berman also submitted an affidavit in which he asserted that the park made the billing changes "because it was attempting to be more legally compliant in its practices, because it was engaging in protected settlement discussions,*** [and because] it was attempting to meet Plaintiffs' ORCP 32 H demands." Even viewed in the light most favorable to BBM, those statements constitute admissions by BBM and Berman that the class-action complaint was a factor that made a difference in the park's decision to institute the billing changes, one component of which was a $20 rent increase.

Further, Berman's singular statement that "the fact that [he] had been sued for charging a meter reading fee"

was not "a factor that went into [his] decision" to raise rent does not establish a material dispute of fact on causation sufficient to preclude summary judgment, even viewing the record in BBM's favor as we must. In response to plaintiffs' summary judgment motion, BBM insisted that a number of purposes motivated the rent increase, including its efforts to meet plaintiffs' demands, made pursuant to ORCP 32 H, that BBM remedy the alleged ORLTA violations raised in plaintiffs' complaint. In other words, BBM took the legal position that it could be motivated by "Plaintiffs' ORCP 32 H demands" while also simultaneously *not* being motivated by the tenants' legal action to assert their rights more generally. But we do not agree that BBM's motivations can be parsed in such a way. BBM would not have been motivated to meet plaintiffs' ORCP 32 H demands but for plaintiffs' act of pursuing legal action against BBM in the first place.

Lastly, a plaintiff need not establish that their protected activity was the sole or dominant cause of the landlord's action. For that reason, BBM could not avoid summary judgment in plaintiffs' favor by noting other causes that may also have motivated the change, such as its asserted "legitimate business reasons for the restructuring" and desire to "to simplify billings, break even on electricity, and keep total rents down." Even if those asserted interests could plausibly constitute reasons for a landlord to raise rent as part of changes to its billing practices, the existence of those other motivations does not negate BBM's admission that plaintiffs' ORCP 32 H demands, and therefore plaintiffs' complaint generally, was a cause of the rent increase decision. In short, we see no material factual dispute on this record that plaintiffs' complaint was a cause of BBM decision to raise rents, and thus reject BBM's argument that the trial court erred in granting summary judgment to plaintiffs on their retaliation claim for that reason.

B.  *BBM's Good Faith Defense and Sixth Assignment of Error*

We next address BBM's sixth assignment of error, in which it contends that the trial court legally erred in striking BBM's good faith affirmative defense as "insufficient in substance and therefore frivolous."

Although the record on this issue is somewhat convoluted, the relevant procedural facts are that in May 2016, over a year after BBM first raised its good faith arguments in opposition to plaintiffs' motion for summary judgment on the retaliation claim, and also nearly a year after the trial court granted that motion and concluded that BBM "violate[d] ORS 90.385 by retaliating when [it] raised rent by $20," BBM, for the first time, pleaded as an affirmative defense that plaintiff Seaman "failed to act in good faith in that before she commenced a claim for retaliation, her lawyers stated that BBM could raise rents to offset for the additional losses resulting from eliminating a park meter reading fee and/or developing a different allocation system to reimburse tenants' electrical usage."[14] Nearly a year later in May 2017, plaintiffs moved to strike that defense, arguing that the defense depended on settlement correspondence that was inadmissible under OEC 408 and that, as a result, there was "no admissible evidence to support defendant's allegation." Plaintiffs also noted that the court had already ruled for plaintiffs on the issue of BBM's liability for retaliation and argued that that ruling rendered the defense moot. In plaintiffs' view, BBM's "time to present its good faith defense was during the pendency of those motions."

BBM responded that the settlement correspondence at issue was admissible and had already been admitted without objection, waiving plaintiffs' OEC 408 arguments. BBM also argued that the motion to strike was untimely, because it was not filed within 10 days of service of BBM's first assertion of the defense. As to plaintiffs' mootness argument, BBM contended that its good faith defense had never been adjudicated or waived and that issues of fact regarding the assertions underlying the defense still remained.

After briefing and argument on the issue, the trial court concluded first that plaintiffs' motion to strike was

---

[14] BBM also asserted good faith as a defense to plaintiffs' claims under ORS 90.315(4) (2011), specifically alleging that plaintiffs "failed to act in good faith in that they did not notify BBM that they believed that they were being allegedly overcharged for electricity or that the park meter reading fees were allegedly a violation of the [ORLTA]." BBM does not raise arguments on appeal that are specific to that aspect of their defense, however, and only raises arguments regarding its good faith defense to the retaliation claim. As a result, we only consider that defense as it relates to plaintiffs' retaliation claim.

untimely. However, the court concluded that defendant's good faith defense relied on settlement correspondence that was inadmissible under OEC 408 and struck the defense as insufficient and frivolous pursuant to its own authority under ORCP 21 E(2).

On appeal, BBM assigns error to that ruling, contending that the trial court erred in its applications of ORCP 21 E and OEC 408. In turn, plaintiffs defend the trial court's ruling on its merits while also offering that the ruling may be affirmed on the alternative basis that the defense was not timely raised because BBM pleaded ORS 90.130 as an affirmative defense long after the trial court granted plaintiffs' motion for summary judgment on retaliation liability. In reply, BBM presses that we disregard plaintiffs' timeliness argument, which it contends was never raised below. Further, BBM contends, "[e]ven assuming there is a legal source for plaintiffs' argument, at best it would give the court *discretion* to strike the defense and would not require it to be stricken as a matter of law." (Emphasis in original.) Discretionary questions, BBM asserts, cannot be affirmed under the "right for the wrong reason" doctrine.

Several points of clarification resolve the parties' arguments. First, plaintiffs *did* preserve their argument that BBM's good faith affirmative defense was untimely or moot when they raised that argument as part of their original motion to strike the defense. As explained earlier, plaintiffs moved to strike BBM's defense on two rationales—both that there was no admissible evidence to support the defense and that the time for litigating BBM's retaliation liability had passed—either of which would, if legally correct, support striking the defense as legally insufficient or frivolous. Whether a pleading or defense is, in fact, sham, frivolous, or irrelevant is a question of law, not an issue left to the discretion of the court. *Ross and Ross*, 240 Or App 435, 439, 246 P3d 1179 (2011) (distinguishing the legal question of whether a pleading is sham, frivolous, or irrelevant from the discretionary decision to strike a matter and preclude further pleading).

As we recently clarified in *Sherertz v. Brownstein Rask*, 314 Or App 331, 341, 498 P3d 850 (2021), *rev den*, 369

Or 338 (2022), the "right for the wrong reason" doctrine is not implicated when an alternative argument was indeed raised in the trial court rather than for the first time on appeal. If "the argument is properly presented again on appeal and raises a question of law, we may simply resolve it, typically remanding only if it is necessary for the trial court to make factual findings from conflicting evidence, exercise discretion, or the like." *Id.* Thus, we may consider such an alternative argument without first determining whether it satisfies the requirements of *Outdoor Media Dimensions, Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (noting additional requirements and discretionary character of "right for the wrong reason" review).

With those considerations in mind, we conclude that BBM has not established that a reversible error occurred here. Even if it constituted legal error for the trial court to strike the defense as frivolous due to its conclusion that no admissible evidence could support the defense under OEC 408, any purported error was harmless, because the defense was also untimely—and therefore insufficient or frivolous—for the reason that it attempted to relitigate a claim that had already been resolved by the court. When a party moves for summary judgment on an issue, "[t]he adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial." ORCP 47 C. Thus, BBM's time to litigate plaintiffs' alleged lack of good faith in bringing the retaliation claim, and in particular, their time to raise ORS 90.130 as an affirmative defense to which they would have had the burden of persuasion at trial, was when plaintiffs moved for summary judgment on that claim.[15] Indeed, BBM did litigate plaintiffs' good faith at that time and the trial court rejected the argument. For those reasons, BBM's sixth assignment of error does not provide a sufficient basis for reversal, even in the event that any legal error occurred, and we reject it.

---

[15] Just as we need not decide whether the trial court erred in striking the defense based on its understanding that no admissible evidence could support the claim, we also need not evaluate whether ORS 90.130 is more appropriately characterized as a regular or affirmative defense. Regardless, BBM's time to litigate its liability for plaintiffs' retaliation claim was when plaintiffs moved for summary judgment on that issue.

C.  *Retaliation Damages and BBM's Eighth Assignment of Error*

Finally, we acknowledge BBM's eighth assignment of error, in which it contends that the trial court erred in granting summary judgment to plaintiffs on the issue of calculating retaliation damages. Specifically, the trial court concluded that ORS 90.375, which permits a tenant who establishes retaliation to recover "an amount up to two months' periodic rent or twice the actual damages sustained by the tenant, whichever is greater," entitled plaintiffs to "damages of double rent for each month the retaliatory rates have been charged."

BBM first contends that "[t]he trial court erred in the same manner that is described *supra* relating to damages" under ORS 90.315(4)(e) (2011), but provides no further explanation as to how we should interpret that solitary statement. Presumably, BBM contends that its arguments as to ORS 90.315(4)(e) (2011)—that plaintiffs are only entitled to a "one-time" award rather than a separate award for each individual violation over time—apply equally to ORS 90.375. However, BBM's arguments as to ORS 90.315(4)(e) (2011) actually engage with the specific text of that statute. Its single sentence argument as to ORS 90.375 does not—it does not account for the varied language defining the violations at issue, the varied measures of penalties, or the differing legislative history or case law relevant to those provisions. Thus, because a construction of ORS 90.375 would differ significantly in its approach and analysis from the construction of ORS 90.315(4)(e) (2011), we conclude that BBM's undifferentiated argument is not sufficiently developed for our consideration.

BBM also raises the additional argument that the trial court erred in granting partial summary judgment to plaintiffs because ORS 90.375 is a discretionary statute that permits a factfinder to award 'up to' or less than two months' rent. Specifically, BBM contends that the trial court "usurped the jury's role" when it ruled on summary judgment that each retaliation class member was entitled to two months' rent as a matter of law. However, the record establishes that BBM argued for the trial court to "make findings

in the present proceeding as a matter of law" and "assess the actual damages suffered by the tenant," at which time it was then "within [the court's] discretion to award '*up to* two month's periodic rent *or* twice the actual damages sustained by the tenant, whichever is greater.'" (Emphases in original.) Due to that record, we conclude that BBM's additional argument regarding ORS 90.375 is unpreserved.

## IV.  CONCLUSION

In summary, the trial court erred (1) in certifying a 10-year class for plaintiffs' claims under ORS 90.315(4) (2011), based on its determination that a discovery rule applied to ORS 12.125; (2) in granting summary judgment to plaintiffs on the ground that BBM violated ORS 90.315(4) (2011) as a matter of law when it charged tenants a higher kWh rate for electricity than the electricity utility had charged BBM; and (3) in granting summary judgment to plaintiffs on the issue of computing damages under ORS 90.315(4)(e) (2011). The trial court did not err in granting summary judgment to plaintiffs on the basis that BBM's $10 "meter reading fee" violated ORS 90.315(4) (2011), or in granting summary judgment to plaintiffs on their retaliation claim. Even if the trial court erred in striking BBM's good faith defense, any legal error in that regard was harmless. Because we reject BBM's third assignment of error, the court's order shifting the costs of class notice to BBM stands. Likewise, because we do not address BBM's eighth assignment of error, the trial court's ruling granting partial summary judgment to plaintiffs on the issue of calculating retaliation damages stands. We do not address the assignments of error raised by B & J and Berman regarding the piercing trial, as those issues may arise differently, or not at all, on remand. Finally, we do not address the assignments of error stemming from the supplemental judgment in this case, although that judgment is reversed by this ruling as a matter of law due to our conclusion that several legal errors underlie the general judgment to which the supplemental judgment applies. We reverse and remand the trial court judgments for further proceedings consistent with this opinion.

Reversed and remanded.